[Civ. No. 16803.   First Dist., Div. One.   Sept. 24, 1956.]

IRVING L. BROOKS, Appellant, v. PAUL L. MUTH
et al., Respondents.

*Assigned by Chairman of Judicial Council.

Rankin, Oneal, Luckhardt, Center & Hall, Robert H. Fouke, Robert A. Wertsch and John Alfred Davis for Appellant.

Burnett, Burnett & Somers for Respondents.

WOOD (Fred B.), J.—The parties entered into a joint venture contract for the feeding and marketing of beef cattle covering the period of March 28 to October 31, 1952. Plaintiff furnished the money for the purchase of the cattle and certain advances to defendants for their care; defendants furnished the ranch, the feed and the care. The main issues upon this appeal pertain to the determination of the question whether this venture resulted in a profit or a loss and in either case, how much. Three clauses of the agreement are especially significant to this inquiry.

The duration of the venture and the accounting period were fixed by subdivision (c) of paragraph 5 of the contract: "(c) On November 1, 1952, the parties hereto agree to account for all cattle and the increment thereof to each other, and to give a full account of their activities and services hereunder; that full and complete books, records and accounts shall be kept by First Party [defendants] as to all cattle received from Second Party [plaintiff] and cattle sold and on hand, including increases of cattle as of October 31, 1952."

The agreement for the sharing of profits and ascertainment of amount of profits was expressed in subdivision (d) of paragraph 5 of the contract: "(d) On November 1, 1952 the

parties agree to divide all gross profits on the basis that forty per cent (40%) shall be retained by Second Party and sixty per cent (60%) shall be paid to First Party. That in ascertaining and determining the gross profits hereunder, the sale price of all cattle sold on or before November 1, 1952 shall be added to the highest cash bid obtainable[1] of all cattle unsold on November 1, 1952, from which sum shall be subtracted the cost of purchasing said cattle and delivering them to the Ranch, including purchase price, commissions, transportation, service on route, and other usual charges in acquiring and delivering cattle, and the balance remaining after said subtraction shall constitute the gross profits as hereinabove referred to. From the sixty per cent (60%) of the gross profits due First Party there shall be deducted and retained by Second Party the monthly payments actually paid by Second Party to First Party pursuant to sub-paragraph a. of paragraph 4 of this Agreement,[2] and the actual payment and retention of the sums due as herein determined shall constitute full and final payment and compensation of the share of each of the parties and shall be binding upon them and shall release each of the parties from any claim of the other.''

By a separate writing addressed to plaintiff (a writing which by the trial court and by this court is deemed a part of the contract) it was provided that ''with respect to paragraph (d) of page 5 [also paragraph 5] of said agreement, in the event of a loss, rather than a profit, we agree to pay you forthwith sixty percent (60%) of said loss.''[3]

The trial court correctly held that the losses, if any, were to be determined and shared in the same manner and proportion as would profits, if any, except that the payments made by plaintiff to defendants pursuant to paragraph 4(a) would not enter into the calculation; i.e., such payments could be recouped only out of profits.

---

[1]Plaintiff struck out ''market value'' and inserted ''highest bid obtainable'' and the parties initialed the change before execution of the contract.

[2]By paragraph 4(a) plaintiff agreed to pay defendants for care of the cattle: $5.25 per month for each cow and its calf; $5.00 per month each for other matured animals.

[3]Defendants contend that this separate writing had no connection with the writing first signed; hence, was without consideration and void. Not having appealed, they are not in a position to challenge the finding. Moreover, we have examined the record and are convinced that the trial court properly read the two writings together in accord with the principles enunciated in section 1642 of the Civil Code and in *Cadigan* v. *American Trust Co.*, 131 Cal.App.2d 780, 782-787 [281 P.2d 332], and the authorities therein reviewed.

Plaintiff handled the taking of bids at the ranch on November 1, 1952. He took written bids only. Defendants protested, claiming that oral bidding was the customary and effective method of ascertaining the "highest cash bid obtainable." On this question the court found upon sufficient evidence that "the accepted practice and custom in the cattle industry to obtain the highest price for cattle is by oral bid, and that there is normally a substantial spread between opening and closing bids"; and that "plaintiff failed and refused to determine the 'highest cash bid obtainable' for the cattle described and referred to in Exhibit A on November 1, 1952; and that said failure and refusal to obtain the 'highest cash bid obtainable' on the part of plaintiff consisted as follows:

"A. Plaintiff refused to meet with defendant Paul Muth and his attorney prior to November 1, 1952 to agree to or discuss any method of obtaining the 'highest cash bid obtainable.'

"B. Plaintiff arrived at the ranch of defendant in the middle of the afternoon of November 1, 1952, passed out written forms of bid calling for lump-sum written bids on the cattle, refused to show said written bids to the defendant or disclose their content to him while the bidders were present, refused to call for oral bids, refused to permit bidders to raise one another, refused to exhibit bids obtained to defendant until late in the evening of November 1, 1952 at a time when it was impossible to see whether any bidders could be induced to raise their bids, and refused to accept the bid of defendants"; and that "the bid of defendants in the sum of $55,000.00 was the highest bid actually made but that said bid was not the 'highest cash bid obtainable' on November 1, 1952."

From these findings the trial court concluded: Plaintiff was obligated to cooperate in obtaining the highest cash bid obtainable. His conduct in connection with obtaining such a bid constituted a refusal to obtain the "highest cash bid obtainable." This refusal was a breach of the contract which relieved the defendants from any obligation to perform the contract on their part. By virtue of plaintiff's said conduct and "by virtue of the failure to obtain 'the highest cash bid obtainable' for said cattle on November 1, 1952 there is no basis or method or evidence on which the court can determine the 'highest cash bid obtainable' for said cattle on November 1, 1952"; that "plaintiff has failed to prove by a preponderance of evidence that there was any loss on November 1, 1952"; and that "plaintiff is not entitled to any judgment against defendants."

The mere fact that plaintiff failed to get the highest bid *obtainable* on November 1, 1952, did not of itself necessarily bar him from the right to have a determination of the amount which could have been obtained had he invited oral bids and given suitable notice. Nor would such a default upon his part necessarily defeat his right to an accounting. Not every default of a partner or of a joint venturer operates to divest him of his interest in the property of the venture or of his right to an accounting.[4] A joint venturer may of course forfeit his rights by a material breach which, committed "at the very threshold of the enterprise," renders it impossible for his associates to proceed (*San Francisco Iron etc. Co.* v. *American Milling etc. Co., supra,* 115 Cal.App. 238, 249); or when he fails to furnish materials essential to the enterprise and stipulated as a condition of the creation of the enterprise (*Staples* v. *Leidecker,* 216 Cal. 604, 606 [15 P.2d 514]), or when he defaults in a material respect and abandons the enterprise. (*Middleton* v. *Newport,* 6 Cal.2d 57 [56 P.2d 508]; *Sly* v. *Abbott,* 89 Cal.App. 209 [264 P. 507].)

But ours is not that type of case. Here the enterprise had been carried out and consummated. The time to divide the profits or apportion the losses had arrived. Plaintiff, in whom the contract vested legal title to the cattle, took the lead in seeking "the highest cash bid obtainable." In that

[4] "'When persons execute a contract which has the legal effect of constituting them partners or joint adventurers, they acquire rights and subject themselves to duties growing out of the fiduciary relationship which they thus create.'" (*Pacific Atlantic Wine, Inc.* v. *Duccini,* 111 Cal.App.2d 957, 965 [245 P.2d 622].) The contract rules which govern in the case of an ordinary contract do not invariably apply to cases of agreements involving the partnership or the joint venture relationship. (*San Francisco Iron etc. Co.* v. *American Milling etc. Co.,* 115 Cal.App. 238, 251 [1 P.2d 1008].) The resemblance between the joint venture and a partnership is so close that "the rights and liabilities of joint adventurers, as between themselves, are governed by the same principles which apply to a partnership." (*Zeibak* v. *Nasser,* 12 Cal.2d 1, 12 [82 P.2d 375]. See also *McSherry* v. *Market Corporation,* 129 Cal.App. 330, 333 [18 P.2d 776].)

"The fact that persons engaged in a joint venture may quarrel or be at odds over the business in which they are associated, or may even be involved in litigation with one another, does not as a matter of law relieve them of their fiduciary duties." (*Sime* v. *Malouf,* 95 Cal.App.2d 82, 97 [212 P.2d 946, 213 P.2d 788].) The failure of a partner to pay his full share of the cost of acquisition or upkeep of the common property does not necessarily terminate his interest in the enterprise (*Kimball* v. *Gearhart,* 12 Cal. 27, 47; *Bowman* v. *Carroll,* 91 Cal.App. 56, 62 [266 P. 840]). Even if a "partner or joint venturer by his wrong has caused the dissolution of the partnership or joint venture he does not forfeit all his rights, although he may become subject to damages and loss of his share in the goodwill." (*Gardner* v. *Shreve,* 89 Cal.App.2d 804, 808 [202 P.2d 322]. See also *Martin* v. *Burris,* 57 Cal.App. 739, 742 [208 P. 174].)

undertaking he failed to get such a bid, though he obtained written bids varying from $48,000 to $55,000. That, however, should not prevent a court of equity from undertaking to ascertain the amount of "the highest cash bid obtainable" for these cattle on November 1, 1952. Essentially the same problem is presented as that which confronts a court or jury when ascertaining the market value of real property taken in an eminent domain proceeding.[5] It is also somewhat like the situation which obtains when the value of property is sought to be determined by use of the test furnished by section 3353 of the Civil Code.[6] The failure of the plaintiff herein actually to get the highest cash bid obtainable should not of itself bar judicial inquiry and determination of the amount of the highest bid that could have been obtained, if evidence on that subject be available.

However, no such question was presented to the trial court. No evidence was offered tending to show the amount of the highest bid that could have been obtained if oral bids had been appropriately sought. There was evidence that oral bidding would have produced the highest bid obtainable and testimony as to the probable spread between the first and final bids if oral bids had been invited, but no evidence upon which to predicate a determination of the highest oral bid that could have been obtained. Plaintiff tried the case, it would appear, upon the theory that the highest written bid actually received ($55,000) was the highest bid obtainable, a theory which the trial court, upon sufficient evidence, found erroneous.

The failure to prove the amount of the highest bid obtainable amounted to a failure to prove whether there was a profit or a loss on the venture; i.e., whether the highest bid obtainable would have been greater or less than $82,-367.25, the difference between the cost of acquisition of the cattle ($93,663.88) and the amount realized upon sales made prior to November 1, 1952 ($11,296.63).

---

[5]In such a proceeding "[m]arket value is the price that would be paid by a willing purchaser from a willing seller purchasing with a full knowledge of all the uses and purposes for which the property is reasonably adapted," (*City of Daly City* v. *Smith*, 110 Cal.App.2d 524, 531 [243 P.2d 46]) quite similar to the test or measure of value specified by the parties herein, "the highest cash bid obtainable of all cattle unsold on November 1, 1952."

[6]That test or measure of value is "the price which he [the seller] could have obtained therefor in the market nearest to the place at which it should have been accepted by the buyer. . . ."

For a discussion of this measure of value and its use, see *Lund* v. *Lachman*, 29 Cal.App. 31, 34-35 [154 P. 295].

■ Accordingly, the trial court correctly found and concluded that plaintiff "failed to prove . . . that there was any loss on November 1, 1952." We perceive no basis upon which a reviewing court could disturb that ruling; hence, no basis for granting plaintiff a retrial of that issue.

This leaves for consideration the question of plaintiff's right to an accounting.[7] The mere fact that plaintiff failed in the due and complete performance of some of his obligations as a joint venturer would not of itself, we have observed, disentitle him to an accounting. However, under the circumstances of this case, we see no basis for reopening it for an accounting.

The failure to prove an overall profit or loss on the venture removes a very important element, perhaps the most important element, from the scope of any accounting that yet might be had. Suppose, for example, it should develop that plaintiff is entitled to a credit in a certain amount against the defendants based upon their activities during the course of the joint venture. Defendants would be entitled to offset that against their share of the profits, if any. But the amount of their share, if any, is no longer ascertainable. This entails the loss of their potential right to an offset. That loss, under the circumstances of this case, is properly chargeable to the plaintiff. Defendants should not suffer for plaintiff's fault.

In addition, the area of accounting has been considerably reduced by the findings made by the trial court on the second, third and fourth counts of the complaint and plaintiff's waiver[8] of his appeal in respect to those findings.

The trial court found untrue (1) the allegations of the second count that defendants violated their obligation to furnish inspection services, treatment and other care for the cattle purchased, as a result of which certain of the cattle proved defective, to the damage of plaintiff in the sum of $9,000; (2) the allegations of the third count that defendants failed in their obligation to care for and maintain the cattle,

---

[7]The trial court held that the defendants gave him an accounting prior to the filing of this action, an incorrect holding because all that they did was to make their books and other records available for plaintiff's inspection.

[8]This waiver appears in plaintiff's opening brief: "While there are other causes of action in the complaint, namely, the second, third and fourth causes of action, as the evidence respecting these is in conflict it will not be necessary to burden this Court with a discussion of the record as it pertains to such causes of action." (A.O.B., pp. 2-3.)

at the ranch, in a good and husbandlike manner, to the damage of plaintiff in the sum of $31,000; and (3) the allegations of the fourth count that defendants obstructed and prevented the sale of the cattle at a time [prior to November 1, 1952] when a profit could have been realized thereon, to the damage of plaintiff in the sum of $31,000. The abandonment of the appeal in respect to these findings would withdraw from the scope of any accounting that might now be had, most if not all of the activities and transactions of the defendants which occurred during the period of the joint venture.

Finally, in response to the issues presented by the first count of the complaint, the trial court among other things found and determined the numbers of the various classes of livestock (cows, calves and bulls) that were originally purchased and brought to the ranch; also, the number that died and the number that were born during the period of the joint venture.

Under these circumstances we perceive no basis upon which we might properly order a further accounting.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied October 24, 1956, and appellant's petition for a hearing by the Supreme Court was denied November 21, 1956.